Case number 12-5457. Food Lion et al. v. Dean Foods Company et al. Argument not to exceed 15 minutes per side. Mr. Gilman, you may proceed for the appellant. May it please the Court. My name is Neil Gilman and I represent plaintiffs Food Lion and Grado. The defendant is conspired to raise the prices of milk sold to plaintiffs and other retailers such as supermarkets. For purposes of this appeal that is undisputed, the District Court twice found that there is sufficient evidence of this conspiracy. The first issue before the Court is whether the plaintiff presented sufficient evidence of antitrust injuries to defeat the summary judge. To demonstrate that antitrust injury and damages, plaintiffs submitted an expert report by Professor Ronald Cotterill. Professor Cotterill used a multiple regression analysis to perform a before and after analysis, which is a methodology that has been approved multiple times by this Court and other courts, for example, in Conroe. Defendants don't challenge Professor Cotterill's methodology. The District Court said, quote, As the Court understands it, defendants do not quarrel with the methodology itself. Professor Cotterill's report, as it relates to antitrust injuries, shows that prices during the conspiracy period were higher than could be explained by supply and demand factors. As Judge Posner held in High Fructose Corn Syrup, that's all that's needed. Summary judgment is inappropriate if a plaintiff shows, quote, Higher prices during the period of the alleged conspiracy cannot be fully explained by causes consistent with active competition. So what happened? After the expert reports were in and the experts were deposed, defendants came up with their argument that Professor Cotterill measured the wrong thing. They claimed that rather than measure the injury caused by the anti-competitive conduct, Professor Cotterill measured price increases caused by the 2002 Dean Suiza merger. As we discussed in our brief, defendants doubted a motion to defer to the magistrate judge, who rejected the argument that Professor Cotterill measured the harm of the merger. The magistrate judge couldn't have been clearer. He said, this Court carefully read the plaintiff's response and, more importantly, Cotterill's report. The Court does not draw the same conclusions from Cotterill's report as do defendants. As we lay out in our briefs, the district court should have deferred to the magistrate judge's finding, reversing all of the clear errors. But the magistrate judge not only didn't commit clear errors, he was absolutely correct. Is there a strong presumption, though, that the district court judge did, in fact, consider the magistrate judge's report and recommendation? Don't we presume that the judge did that in this particular case rather than rest on some kind of appellate concept between the magistrate judge and the district court judge? Well, First Your Honor, I don't think we're resting on the appellate concept. As I said, I think under any standard of review here, Professor Cotterill's report was admissible. And I don't think it's clear that the district court did rely on the magistrate judge or did review the magistrate judge. But even in those cases where it's not particularly clear, we assume that the district court judge did. I mean, I think that's the tenor of the case here. Well, I think we can't – the district court gave no reasoning why the magistrate judge's conclusion was clear error. And, in fact, the defendants don't even defend the case on that ground. They don't say that the district court reversed the magistrate judge on the doubt or reviewed it for clear error. They say he looked at something completely different. The question was summary judgment. So they're not even making that argument that we're presuming that. And as I think we said on briefs, there really – in this particular case, there's no way to thread the needle between what the magistrate judge found for admissibility and what the district court judge found for summary judgment. If the magistrate judge's conclusion is right, then we have admissible evidence of antitrust injury. If the magistrate judge was wrong, then – and if the district judge was right, obviously, he said we didn't have evidence of antitrust injury. It was the same thing. But for the purposes of this court, even if you assume the magistrate judge – that the district court did review for clear error, that informs this court's review. Was the district court correct in finding that the magistrate judge committed clear error? Not – it's not a full-blown abuse of discretion whether to let the evidence in. Counsel, if I understand the structure of your argument, you – there's the first argument and then there's the last three arguments. You have to win on the first and one of the other three is how it works. That's correct. Which of the other three is the – under the way you've structured it and the way you analyze it, you only have to win on one of the other three, which is the weakest – which is the strongest for you? We think that the first argument is the strongest. Can you address that, please? Sure. You're saying it's horizontal and not vertical? That's correct. It kind of looks vertical, though, doesn't it? Not at all. There were two conspiracies alleged in this case. In count one, we alleged a horizontal conspiracy between NDH and Dean to restrain the sale – restrain competition in the sale of bottled milk to companies like Food Lion and the other plaintiffs. DFA was a raw milk supplier, but it was also the owner of NDH and controlled NDH. There's a key footnote in the district court's opinion that says that much of our argument as to DFA depends on proving that DFA is controlled NDH. And as the district court said, there was sufficient evidence of that. So part of the conspiracy is some sort of agreement between Dean and DFA, right? Well, what happened was Dean agreed to give DFA a full supply agreement in order to agree to the horizontal conspiracy. That's just sort of how they paid it off, is that the idea?  And I think – was that agreement considered and approved as part of the Justice Department agreement with the merger, or did that agreement happen afterwards? My understanding is it happened afterwards, but I will not say where in the record it says that. It seems like it would make a difference. If it had been approved, then it's less likely to – it seems – I don't know. Indirectly, it seems to affect how vertical or horizontal it was. I'm not sure. I follow what you're saying. But do you understand what I'm asking, though? Where in the record it indicates whether this agreement between – let me see if I'm getting the parts right – between DFA and Dean to – what did it do? Dean agreed full supply – it was a full supply agreement. Is that a post-merger agreement? Full supply agreement or not? I believe it is, Your Honor. And you might be able to cite that. I do know that DFA had a full supply agreement with the squeezer, which is one of the merging parties. And not Dean. And that the creation of MDH, part of the reason for that was to get the full supply agreement. They wanted – DFA wanted a full supply agreement. I'm curious about the timing of it. It may not make a difference, but that's something. I will determine that and come back to rebuttal. But I think the Supreme Court's decision in Legion actually speaks to this. As the court explained there, the vertical agreement could provide, quote, useful evidence for a plaintiff attempting to prove the existence of a horizontal conspiracy. And that's at 127 Supreme Court, 2717. And that's what we have here. This is a payoff. There's a horizontal conspiracy. There's no difference between giving them a full supply agreement to pay off or if they paid off the owners of the company with giving them a million dollars a month. That would still be a horizontal conspiracy. And I'd like to cite at least two cases, Your Honors, that make this point. These are cases that are not in your brief? No, no. These are cases that are in our brief. The first is Palmer v. BRG. That's a Supreme Court case. Palmer, in Palmer, there was a market allocation agreement between two borrowing companies. The conspirators agreed that BRG would get Georgia and HBJ would get the rest of the country. That was the horizontal aspect. They also agreed that BRG would buy all its books and other materials from HBJ. That was the vertical aspect. The defendants defended the case by claiming that they were in a, quote, vertical supplier-retailer relationship. This is all described in the Eleventh Circuit opinion, which is at 874 F. 2nd, 1417. It's even clearer in the dissent, which said first, quote, as an initial matter, HBJ and BRG argued that the plaintiff's horizontal per se theories did not apply to them because they are in a vertical supplier-retailer relationship. Then the dissent said, it's, quote, firmly established that entities in a seemingly vertical relationship may be capable of horizontal restraints if they are actual potential competitors. If the majority opinion in finding that was not a per se violation prevailed, defendants might have an argument here. But the Supreme Court decided this is an easy case. They asked the government for its opinion. So, Ass. Gen. Ken Starr, at the time, filed his brief on the cert petition. The court reversed finding the per se on the cert petition, no briefing, no argument. Easy case, had the same type of vertical elements that they argue here. There's a naked horizontal agreement not to compete. One of the conspirators is also in a vertical relationship and is taking advantage of that vertical relationship to get paid off. But the fact of consideration here for the naked horizontal agreement is to pay off the parent company for a supply agreement that doesn't affect the per se nature of the underlying conspiracy, which is a naked agreement. Another case that we cite in our briefs is the in-ranked insurance brokerage case. That's a very similar case as well. In that case, the defendants argue that the vertical elements in the alleged conspiracy took them out of the per se world. But the thirds are to explain that defendants' contention draws on a fundamental principle of antitrust law but misapplies it. Basically, like the defendants here with the supply agreements, the defendants in that case argue that the vertical aspect of the agreement is some pro-competitive benefits. But this didn't matter because the horizontal agreement wasn't integral or ancillary to the vertical agreement. What's the name of that case? It's the in-ranked insurance brokerage case. It's in 618S3300. And as the court said in finding a per se violation, defendants can't identify, quote, any pro-competitive venture to which the insurers allege horizontal agreement not to compete for incumbent business could reasonably be deemed integral. And that's what we have here. There is no pro-competitive justification for a horizontal agreement between Dean and MDH to allocate markets not to compete closed plans by agreement. The defendants argue that those decisions were pro-competitive because they enhanced efficiencies and that they were unilaterally undertaken. But that's what the merit of the case is. If they undertook it unilaterally, then obviously there's no conspiracy and no Section 1 violation. So you can have a per se case or cases analyzed per se but still have factual disputes as to whether the elements of the case have been met or not. That happens all the time. That's every price-fixing case. Defendants fix the price. They already know we followed the leader. We didn't actually reach an agreement. But if it's found to be by the jury that the conspiracy existed, those are always per se. Thank you. Thank you. May it please the Court. My name is Paul Friedman. I represent Dean Foods Company, and I will speak on behalf of all defendants this morning. Judge Breyer granted summary judgment for the defendants on two independent grounds, each of which is sufficient to uphold the judgment below. First, Judge Breyer correctly determined, and I'll address it in length, that this case was subject to rule-of-reason analysis, which required proof of a relevant geographic market, and plaintiffs failed to prove the relevant geographic market. Second, Judge Breyer held that plaintiffs failed to prove causal antitrust injury, that is, injury caused by the conspiracy alleged and that flows from the anti-competitive aspect of the violation. Either ground, as I said, is sufficient to uphold the judgment below. Judge Breyer got it right on both grounds. Let me just address one thing about counsel's comment about the status of the case. For purposes of this appeal, the issue of whether or not the conspiracy is established is beside the point. Judge Breyer ruled that there was sufficient evidence to present that to the jury. It's not established as a matter of fact. There's a matter of law, for instance. But it's simply irrelevant. Correct. So, Your Honor, this has to be judged as a rule-of-reason case because the horizontal element of the conspiracy that plaintiffs claim, that is, an agreement between Dean Foods and National Dairy Holdings, NDH, milk processors, to engage in market allocation, price-fixing, makes no economic sense from NDH's perspective. It's economically plausible. This isn't my words. This is the plaintiff's words below. They said, and they said it in their brief to this court, I believe it was at page 15, that it's not obvious why NDH would enter into a conspiracy that would lead to its destruction, its demise. That all sounds very horizontal to us. That is the horizontal piece, and that horizontal piece was presented to the court, and the judge and we expressed a great skepticism. We had a motion to dismiss argument. We talked about Twombly. Judge Brewer actually said he had prepared an order granting the motion to dismiss on Twombly grounds, but thought because discovery had been proceeding, it would be better for this court to review it with a full record on summary judgment. That doesn't respond to Judge Van Daycombe's comment. It sounds horizontal. So, yes, the allegation that Dean and NDH conspired to allocate markets and customers is horizontal, and it is implausible, and so what the plaintiffs did is they said repeatedly in their complaint at paragraph 4, in their arguments to Judge Brewer, in their motions to Judge Brewer, that this conspiracy is, their words, a quid pro quo conspiracy, and the quid pro quo conspiracy was an arrangement that was vertical. Dean Foods agreed to buy its raw milk requirements from Dairy Farmers of America, DFA, the co-op, in exchange for which DFA, the plaintiffs say, would run NDH, the horizontal piece, as a faux competitor. Plaintiff says, under Palmer, that's still okay. You're always going to have some vertical element, even in a pro se case, because there's always those relationships. Well, plaintiffs, I'm sorry, I didn't mean to... No. Plaintiff's discussion of Palmer, with all due respect, is a little bit incorrect and incomplete on the facts of the case. In Palmer, BRG was a bar review course provider in Georgia, and Harper Brace Jovanovich, HBJ, was a provider of content and a provider nationwide of bar review courses, including in Georgia. They were direct horizontal competitors in the state of Georgia for four years. In the course of that direct horizontal competition, prices for bar review courses fell from $450 to $150. HBJ was losing its shirt. It withdrew from the market. And a month after that, it then entered into a vertical relationship, in quotes, Your Honor, with BRG. And the vertical relationship with BRG was, we'll license you, BRG, to use our name, Bar Review, and we'll sell you our bar review materials. You stay in Georgia, and we'll stay in every place else, and we won't compete. And what the court said is, look, you can't put lipstick on a pig and say it's not a pig. I mean, it was a horizontal geographic market allocation, which they added this little fig leaf on to dress it up to try to fool people. That's not what's going on here. Let me ask you something. I'm kind of a neophyte with respect to that. Maybe I'll get this in a confused fashion. You have to straighten me out. You've got two companies that compete. They make widgets, and there's certain people who buy widgets. And when someone offers to have a deal about widgets, they come in and say, no, we can sell them to you for less. That kind of competing is going on. Then, in my hypothetical, one company, company A, goes to company B's owner and says, get your company to stop bidding against us. And if you do, well, we'll buy a $10,000 house for $2 million from you. And we'll use them parenthetically. We'll use the monopoly rents that we get by not having these competitive bids. Would that be horizontal, or would that be vertical? So I think that the court would probably analyze that, most likely, as primarily a horizontal conspiracy. How is it vertical at all? Just because they did the deal with the owner of the other company? I'm not sure that it is. I'm not sure that it fits. So how is this different from that? Well, so here's how this is different. Beginning in 1998, Suiza, which was the predecessor of Dean, was a small company processing milk. Mid-Am was the predecessor of DFA. It was a co-op. It also had joint ventures in milk ventures. Suiza said, we will buy our milk requirements, entered into a vertical relationship with DFA to buy its milk requirements. DFA said, great, we need a home for our farmer's milk. That's a vertical relationship. In exchange, as Suiza grew, DFA invested in Suiza. It was a part owner. When it came time for the merger, Suiza had to buy out DFA's interest in Suiza. And in order to buy out Suiza's interest, I'm sorry, DFA's interest in Suiza, DFA said, we still want to have milk supply, so we will continue to supply your plants that you already own. We have an agreement that says that. And we'd like to supply milk to the new plants that you're going to buy. That's the vertical aspect of this relationship. And that's vertical, but the argument is that's a vertical, you can call it vertical, but what's actually happening is it's extremely generous from one side to the other and therefore constitutes a payoff for this declining to compete, which even you say is horizontal. Well, whether it's generous or not, whether it's a payoff or not, would be a question of fact. That's the whole point. Well, Your Honor, their point was that what they told Judge Greer, because the horizontal aspect that we're focusing on, it was economically implausible. There was no reason for But that would be true in my widget example. It's economically implausible that you wouldn't make a bid and try to compete. Well, actually, no. Bid-brigging conspiracies between two firms typically are in the economic self-interest of the conspirators. That's why people enter into conspiracies. That's illegal. It is illegal. What's different about this case and what they admit is that unlike the typical horizontal conspiracy, if you simply looked at the naked horizontal agreement that they talk about between Dean and NDH, there's nothing in it for NDH, absolutely nothing. And so the only way But isn't that the case? In my example, it was intended to be constructive where that was also the case. So you can make me tinker with the example. So the idea is that you have two competitors, and one of them doesn't do what normally would economically drive them to do. It just doesn't do it. It doesn't compete. It's either by bid-brigging or not going into Arizona or doing things that would be economically advisable for him to do. But he doesn't do them, and the reason he doesn't do them is because he's getting a payoff, not because it's arguably economically reasonable. He's doing it because he's getting a payoff. In my example. I'm not saying that's happening in your example. But in my example, when I'm asking you how that's different, it seems like you're sort of tinkering with my example and making it economically feasible for him to not compete. Well, let me try to address your example directly and see if I get it right. So in your example, if Company A and Company B both make widgets and they both compete for the same customer, what typically happens is that the customer wins because as a result of that competition, the customer gets a better price, better product. That's the way it's supposed to work. When there is a horizontal conspiracy between two firms competing at the same level, then what they typically do, bid-brigging, market allocation, is you take this guy. I'll take that guy. My example is different, but my example is they just don't compete. They do stupid things. They don't say, you take this guy. I'll take that guy. They say, you take every guy that might want to buy from you. We won't compete with you. We're going to prove our chances. So if there were direct evidence of such a conspiracy, then I would say that the court likely would treat that as a horizontal conspiracy, subject to per se condemnation. But what's different here is there's no direct evidence of such a conspiracy. And the issue that Judge Greer agreed was, to go to the jury, was a circumstantial conspiracy case that was based on... So your argument now is not that the conspiracy that they're describing in their briefs has a vertical component that requires rule-of-reason analysis, but just that there's not enough evidence of that kind of conspiracy?  If I gave that impression, I don't mean to say that at all. Then let's go back to the conspiracy that they describe. They describe the conspiracy, which seems very similar to the one I've described. So what they told Judge Greer during the summary judgment argument, and I would direct the court to record site 20061, they said to Judge Greer, with respect to that conspiracy, he couldn't take apart the vertical piece from the horizontal piece. He had to consider, and this is a quote, the entire big ball of wax. And then also in that argument, they said at 20022, quote, the full supply agreements are a component of the conspiracy to eliminate competition and to raise processed milk prices. And again, in a motion to compel, at record site 2351, they said at the heart of cap one lies a quid pro quo agreement. That is, this vertical and horizontal agreement. So repeatedly, they told Judge Greer, this is not a naked horizontal agreement that we're putting in front of you. It is a great big ball of wax that has a supply agreement that's vertical and it has a horizontal agreement. They're characterizing, as I understand it, in their briefs, they characterize what you're calling the vertical part as a means of payoff for a horizontal scheme. And what the springboard... I'm trying to get what the answer is. At points, you seem to be saying there isn't enough evidence of such a scheme. At other points, you seem to be saying assuming there's such a scheme, it's vertical. So what I will say... I'm trying to get an answer to the latter question. So assume that there is evidence of this scheme, that it is this quid pro quo agreement. It is necessarily not a naked horizontal agreement. It is vertical. Then how is it different from my example? Well, in your example, what motivates the firm to behave irrationally in a way that is not in its economic self-interest, the horizontal agreement, is this vertical agreement. And the question that the courts said, the Supreme Court has said repeatedly, is that where you have this vertical component that may have efficiencies, that may benefit consumers, you have to engage in rule-of-reason analysis. I asked you a lot of questions, and my colleagues have questions. You have a few more minutes. I did want to touch on antitrust injury as well. Well, let me very briefly talk about relevant market. The review of Professor Frove's, the exclusion of Professor Frove was for the use of discretion. I think there really is and can be no question that what Professor Frove did did not complete with the rule established by Tam Electric, and he didn't even follow the merger guidelines that are promulgated by the Department of Justice in the antitrust measure. So his testimony was correctly excluded, and that means that the plaintiffs cannot prove an essential element of their case under rule-of-reason analysis. With respect to antitrust injury, I think that the argument about what standard of review Judge Greer applied to Judge Inman's ruling is a straw man, it's a red herring. Judge Greer made his own analysis of what Professor Cotterill had done, and it was plain from Professor Cotterill's report, it was plain from Professor Cotterill's testimony, that what he measured was not antitrust injury. What his model did is deconstructed, undid the merger. It said, it asked the question, are prices today higher than they would have been if the merger had never occurred? What he should have done to create a proper but-for world is ask, are prices today higher than they would have been if there had been no conspiracy? He didn't ask that question. And because of that, he failed to present any evidence of antitrust injury, and the court was clearly correct on that. Thank you. Thank you. You have three minutes. Thank you, Your Honor. The first thing I just want to say is, in R670, paragraph 202, it says that the agreement that we were discussing earlier was signed on January 1, 2003, which is after the merger. But we can put in... That's the point in the record that answers my question. I believe it is. That's fine. Okay. If you would like, we could put in... You said the numbers were right for fines. Okay. If that turns out not to be correct, we will confirm that and inform the court. On the per se issue, I think Your Honor's questions were exactly right. Mr. Friedman was basically suggesting that we can't prove a per se conspiracy because we don't have the evidence to prove a per se conspiracy. We have the evidence. And if we don't prove a conspiracy, we lose on the ground that there is no conspiracy, not on the ground that the conspiracy we play and try to prove is not per se. This is a horizontal agreement. The payoff here happened to be a supply agreement. It could have been money out of pocket. There are a million ways to pay off. As the court said in Legion, these kind of vertical agreements are indicative of and can be used to prove horizontal agreements. That's what we meant when we said... Let's assume, though, that we don't agree that that's the case. We agree that the district court got it right in terms of the rule of reason analysis. What happens then? Well, a couple of things. One, we're assuming that we do have evidence of antitrust injury. Then the court could find that that evidence is direct effects under this court's real compensation because that evidence, contrary to what Mr. Friedman said, shows that there was injury caused by the merger. That is more than enough in real time to prove direct effects. Or this court could find that a quick look analysis is appropriate. I mean, California, Danville, and again, this court's cases, because even though it's not white per se... It feels a lot like that gets you back to the per se... Well, the quick look is essentially... In a per se, you don't look for any pro-competitive justification. In a quick look, you take a quick look. Is there any pro-competitive justification? There is none, and then essentially you are back. And that's what we have here at best because there is no pro-competitive justification for the horizontal agreement not to compete. As Mr. Friedman said, NDH basically disadvantaged itself and they agreed not to compete in a way that raised prices. That's a perfect case for quick look. Or this court could find that we do have evidence of geographic market. You know, they relied almost exclusively on what Professor Froh said, one sentence out of the deposition. He's had a 100-page report, a huge rebuttal report that you all have. It follows the merger guidelines in one little implementation issue where he used a competitive price versus the actual prices and where their expert even said that's a matter of academic debate. Some people do it that way, some people do it the other way. There are good reasons for it. Professor Froh explains that it's because of self-enthalpsy that he believes you need to do it that way. A lot of people agree with that. And so you have multiple ways to reverse the district court summary judgment. Thank you. So a very interesting case. The case will be submitted. Please call the next case.